UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,

v.

CARL MARLINGA,

                Defendant.

_____/

CRIMINAL NO. 04-80372

DISTRICT JUDGE VICTORIA A. ROBERTS

MAGISTRATE JUDGE DONALD A. SCHEER

## REPORT AND RECOMMENDATION

**I.**    **RECOMMENDATION**:

I recommend that Defendant's Motion to Dismiss Second Superseding Indictment be GRANTED in PART by striking from paragraphs 3, 6 and 8 of Count Two the language asserting the existence and violation of a right of the Michigan Supreme Court to honest services of the Defendant, as reflected in Exhibit A to this Report. In all other respects, I recommend that the Defendant's Motion to Dismiss Second Superseding Indictment be DENIED.

**II.**    **REPORT**:

Defendant is charged in a Second Superseding Indictment with the following offenses: **Count One**: Bribery, 18 U.S.C. §666; **Count Two**: Mail Fraud, 18 U.S.C. §1341; **Count Three**: Bribery, 18 U.S.C. §666; **Count Four**: Wire Fraud, 18 U.S.C. §1343; **Count Five**: False Statement to an Agency of the United States, 18 U.S.C. §§1001(a) and 2(a); and **Count Six**: Procuring a Campaign Contribution Exceeding Legal Limitations, U.S.C. 2 §§441a(a)(1)(A), 441 a(8) and 437g(d), and 18 U.S.C. §2.

The Indictment was returned December 15, 2005.  On January 2, 2006, Defendant filed a motion to dismiss Counts One through Six, inclusive.  The motion was referred to the undersigned magistrate judge on January 3, 2006.  The parties appeared for hearing on February 8, 2006, and the matter was taken under advisement.

The Indictment contains the following general allegations:

1.  From January 1, 1985 through December 2004, defendant Carl Marlinga was the elected Prosecuting Attorney for Macomb County, Michigan, located in the Eastern Judicial District of Michigan.  A county prosecutor, as a public servant and elected official, owes a duty to the public to make all prosecutorial decisions based solely on the public good, and to render only fair and honest services, untainted by considerations of personal benefit or gain, or by conflicts of interest.  A county prosecutor also owes a duty to the courts before which he practices to provide the courts only with information the prosecutor believes to be accurate.

2.  At all times material to this Indictment, Carl Marlinga was a candidate for election to the United States House of Representatives in the 2002 election from Michigan's 10th Congressional District.  His official campaign fund raising committee for that race was entitled "Carl Marlinga for Congress."

3.  In 1991, Jeffrey Moldowan and his codefendant Michael Cristini were convicted of the crimes of Assault with Intent to Commit Murder, Criminal Sexual Conduct, and Kidnaping in connection with an attack on a particular individual in August, 1990.  The cases were entitled People of the State of Michigan v. Jeffrey Moldowan and People of the State of Michigan v. Michael Cristini.  All appeals were exhausted by 1995.

4.  Jeffrey Moldowan prepared post-conviction legal proceedings seeking a new trial which were filed in 1999.  From the inception of those proceedings through December, 2001, the Macomb County Prosecutor's Office vigorously and successfully opposed all efforts for a new trial for Moldowan.

5.  On September 27, 2001, James Hulet was charged in Macomb County with several offenses, including Criminal Sexual Conduct, Delivery of a Controlled Substance to a Minor, Felony Firearms, Possession with Intent to Deliver a Controlled Substance, Possession of MDMA (Ecstacy), Maintaining a Drug House, and Contributing to the Delinquency of a Minor.  At all times material to this Indictment, James Hulet was represented by two attorneys.

6.  In addition to the criminal charges facing James Hulet, he also was the defendant in a civil case filed by the victim of the criminal sexual conduct.  In that civil case, the victim was represented by attorneys who sought a large amount of money.  James Hulet was represented in the civil case by the same attorneys who represented him in the criminal case.

7.  The Federal Election Commission is an agency created by Congress.  At all times material to this Indictment, one of the functions of the Federal Election Commission was to enforce the Federal Election Campaign Act of 1971, as amended.

8.  At all times material to this indictment, federal law provided reporting requirements for all contributions to candidates for the United States House of Representatives.  Among other provisions, all candidate committees were required to file reports with the Federal Election Commission disclosing the "identification," that is, the name, address, and employer of any person contributing in excess of $200 within a

3

calendar year, and the total amount contributed by each such person.  Such reports are publicly available through the Federal Election Commission, and constitute the only legally required method by which federal candidates must disclose their contributors.

9.  At all times material to this Indictment, federal law prohibited any individual from contributing more than $2,000 to any candidate for Congress ($1,000 for a primary election, and $1,000 for a general election).  For purposes of federal law, "all contributions made by a person, either directly or indirectly, on behalf of a particular candidate, including contributions which are in any way earmarked or otherwise directed through an intermediary or conduit to such candidate shall be treated as contributions from such person to such candidate."  A "conduit" or "intermediary" is a person "who receives and forwards an earmarked contribution to a candidate or a candidate's authorized committee[.]"

10.  From January, 1993, through December, 2002, James A. Barcia was a Representative from Michigan in the United States House of Representatives.  While a member of Congress, James A. Barcia's official campaign fund was "Barcia for Congress." While a Member of Congress, James A. Barcia also sponsored a federal political action committee called "Progressive Leadership for America."  In 2002, James A. Barcia was elected to the Michigan State Senate.  James A. Barcia's official campaign fund for his 2002 Senate race was "Friends of Jim Barcia."

## COUNT ONE

Title 18 United States Code §666 provides, in pertinent part, as follows:

4

**§666.  Theft or Bribery Concerning Program Receiving Federal Funds**

(a) Whoever, if the circumstances described in Subsection (b) of this Section exists -

> (1) Being an agent of an organization, or of a state, local or Indian tribal government, or any agency thereof - -

> *                    *                    *

> (B) Corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person intended to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more;

> *                    *                    *

> shall be fined under this Title, imprisoned not more than ten years, or both.

> (b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of federal assistance.

18 U.S.C. §666.

Count One of the Second Superseding Indictment alleges that Defendant, as Prosecuting Attorney for Macomb County, Michigan, was authorized to act on behalf of a local government agency, the Macomb County Prosecutor's Office, and was therefore an agent of that government agency, which had received federal benefits in excess of $10,000 during 2001 and 2002.  The Government alleges that, from December 18, 2001 to and including July, 2002, Defendant corruptly solicited and demanded for his benefit, and accepted and agreed to accept, contributions to and promises of fund-raising efforts on

5

behalf of "Carl Marlinga for Congress," his congressional campaign committee.  It is further alleged that Defendant's solicitations were made with the intent to be influenced and rewarded in connection with "any business, transaction or series of transactions of the Macomb County Prosecutor's Office involving a thing of value of $5,000 or more, specifically the criminal case of People v. Moldowan.   The Government claims that Defendant was motivated by the contributions and promises of fund-raising efforts to draft and file with the Michigan Supreme Court a "Motion to Permit the Plaintiff-Appellee to Amend Previously Filed Answer to Defendant-Appellants Delayed Application for Leave to Appeal," and that he corruptly accepted and agreed to accept such contributions with the intent to be rewarded in connection with the filing of the motion.

Defendant challenges Count One of the Second Superseding Indictment on the following grounds:

> The statute requires that the intent of the alleged payment be to influence a public official "in connection with any business, transaction, or series of transactions . . . involving anything of value of $5,000 or more" of the public body which he or she serves.   The Indictment identifies the subject "business transactions or series of transactions" as being the criminal prosecution[] of Jeffrey Moldowan . . .. However, such criminal prosecution[] [is] not, and cannot be, "business, transaction or series of transactions" within the meaning of the statute, because: (1) [it is] not the kind of business affair[] contemplated by the statute; and (2) [it is] not subject to the kind of valuation which the statute requires.

Motion to Dismiss, page 2.

Defendant correctly observes that the statute does not define the terms "business" or "transaction."  He rightly maintains that an undefined statutory term "receives its ordinary and natural meaning."  Limited, Inc. v. C.I.R., 286 F.3d 324, 332 (6th Cir. 2002).  Defendant

6

offers <u>Hartford Fire Ins. Co. v. California</u>, 509 U.S. 764, 781 (1983) in support of the proposition that "business" as a collective noun is "most naturally read to refer to '[m]ercantile transactions; buying and selling; [and] traffic.'" In that case, however, the Supreme Court was interpreting the term "business" as used in the phrase "the business of insurance" contained in Section 2(b) of the McCarren-Furguson Act, 15 U.S.C. §1012(a). In view of the specific context in which the word was defined, it is doubtful that the Court intended the definition to apply in all statutory contexts.

As further support for his position that a criminal prosecution cannot be "business, transaction or series of transactions" within the meaning of Title 18 §666, Defendant relies upon the following definition in <u>Black's Law Dictionary</u>:

> **business.** 1. A commercial enterprise carried on for profit; a particular occupation or employment habitually engaged in for livelihood or gain.  2. Commercial enterprises <business and academia often have congruent aims>.   3. Commercial transactions <the company has never done business in Louisiana>.   See DOING BUSINESS.   4. By extension, transactions or matters of a noncommercial nature <the courts' criminal business occasionally overshadows its civil business>.  5. *Parliamentary law*.   The matters that come before a deliberative assembly for its consideration and action, or for its information with a view to possible action in the future.   In senses 2, 3, and 4, the word is used in a collective meaning.

<u>Black's Law Dictionary</u> 211 (8th Ed. 2004).  Defendant emphasizes that definition number 4 includes "transactions or matters of a noncommercial nature" only "by extension."  Based upon that characterization, he argues that the inclusion of "matters of a noncommercial nature" expands the term "business" beyond its ordinary and natural meaning.  I disagree, for two reasons.

First, <u>Black's</u> definition number 1 includes "a particular occupation or employment habitually engaged in for livelihood or gain."  So defined, the term "business" is broad enough to include the exchange of virtually any regularly pursued labor in exchange for pay.  The filing and prosecution of criminal litigation on behalf of the People of Michigan is an employment habitually engaged in for livelihood by an elected county prosecutor and his assistants.  In my view, it is quite ordinary and natural to consider the prosecution of criminal cases for livelihood as the "business" of a prosecutor.  Although it is public service work, the fact that prosecuting is remunerated confers a sufficiently commercial character to warrant the application of the term "business."

Second, I am satisfied that <u>Black's</u> fourth definition, extending the term "business" to "transactions or matters of a noncommercial nature," is so broadly accepted as to be an "ordinary and natural meaning."  Police, prosecutors and judges routinely employ the terms "police business," "government business," and "court business" to the work routinely performed by them in investigating, litigating and adjudicating criminal cases.  Such terminology is widely employed and understood.

While both Defendant and the Government acknowledge a paucity of case law on the subject, there is authority for a broad interpretation of "business" as it is employed in Section 666.  The Government has cited case law demonstrating that context and considerations of legislative intent serve to inform a court as to the meaning of statutory language.  In <u>Salinas v. United States</u>, 522 U.S. 52 (1997), for example, the United States Supreme Court considered legislative history prior to enactment of §666 in order to determine whether it required that a bribe have a demonstrated effect upon federal funds. The Court recognized the general rule that courts must follow the plain and unambiguous

8

meaning of statutory language.    Nonetheless, in construing §666(a)(1)(B), the Court

considered the statutory framework in existence before its enactment and concluded that

the section "was designed to extend federal bribery prohibitions to bribes offered to state

and local officials employed by agencies receiving federal funds."  522 U.S. at 58.    In

making its decision, the Court observed that "[n]o rule of construction . . . requires that a

penal statute be strained and distorted in order to exclude conduct clearly intended to be

within its scope . . .."  Id. at 59.  The Court rejected the appellant's narrow interpretation of

the statutory language.    "A statute can be unambiguous without addressing every

interpretive theory offered by a party.  It need only be 'plain to anyone reading the Act' that

the statute encompasses the conduct at issue."  522 U.S. at 60 (citations omitted).

   While the Salinas decision did not address the definition of "business" as the word

is employed in §666, the U.S. Court of Appeals for the Second Circuit has done so, and has

adopted a more expansive definition than that urged by Defendant in the case at bar.

     [T]here are a number of factors in favor of construing §666 to
     cover corruption of agents of a federally funded organization
     even in those official activities that do not implicate their
     organization's own funds.  First, the actual wording of the
     statute arguably allows room for a more expansive reading.
     "Business," broadly defined, includes "work," "professional
     dealings," "one's proper concern," and "serious work or
     endeavor that pertains to one's job."  American Heritage
     Dictionary 180 (1973).  Also, at least on its face, the statute
     does not say that the thing of value of $5,000 must be that of
     the affected organization.

United States v. Bonito, 57 F.3d 167, 172 (1995).  To be fair to Defendant's argument, it

should be noted that the Second Circuit only extended the definition of "business" to include

the dealings of a government official in connection with a discrete "transaction," which it

held to imply a concluded business agreement.  Id., at 173.  The Court left open the

question of how far the statute should reach when the organization whose integrity is sought to be protected has no financial stake whatsoever in the corrupted business.

That question may have been partially answered by the Supreme Court in <u>Sabri v. United States</u>, 541 U.S. 600 (2004). The case dealt with a challenge to the application of §666(a)(2). In <u>Sabri</u>, one count of the Indictment charged the defendant with offering a $5,000 kickback to a city councilman in exchange for obtaining various regulatory approvals. Count Two charged Sabri with offering the same individual a $10,000 bribe to set up and attend a meeting with owners of land located near property owned by the defendant. In exchange for the bribe, the councilman would threaten to use the city's eminent domain authority to seize their property if they were troublesome to Sabri. Another count alleged that the defendant offered the councilman a 10% commission on approximately $800,000 in community economic development grants that Sabri sought from the city. None of the charges appear to have been based upon discrete commercial transactions by the councilman on behalf of the city. Sabri moved to dismiss the Indictment on the ground that the statute "fails to require proof of any connection between a bribe or kickback and some federal money." 541 U.S. 600, at 604. The district court agreed with the defendant. A divided panel of the Eighth Circuit, however, reversed. The Supreme Court granted *certiorari* to resolve a split among the circuits over the need to require a connection between forbidden conduct and federal funds.

In affirming the Eighth Circuit, the court observed that:

> Congress has authority under the Spending Clause to appropriate federal monies to promote the general welfare, Art I, Section 8, cl. 1, and it has the corresponding authority under the Necessary and Proper Clause, Art I, Section 8, cl. 18, to see to it that taxpayer dollars appropriated under that power

> are in fact spent for the general welfare, and not frittered away in graft or on projects undermined when funds are syphoned off or corrupt public officials are derelict about demanding value for dollars.
>
> *                    *                    *
>
> Congress does not have to sit by and accept the risk of operations thwarted by local and state improbity.
>
> *                    *                    *
>
> Section 666(a)(2) addresses the problem at the source of bribes, by rational means, to safeguard the integrity of the state, local, and tribal recipients of federal dollars.

541 U.S. 600, at 605. Citing to the Court's examination (in <u>Salinas</u>) of the statutory framework prior to the enactment, Justice Souter observed once again that §666 "was designed to extend federal bribery prohibitions to bribes offered to state and local officials employed by agencies receiving federal funds." 541 U.S. at 607 (citations omitted). He further observed that "Congress' decision to enact §666 only after other legislation had failed to protect federal interests is further indication that it was acting within the ambit of the Necessary and Proper Clause." <u>Id</u>. Rejecting the argument that §666 is of the same character as other federal statutes that had been held to exceed congressional authority under the Commerce Clause, the Court held that Congress was "within its prerogative to protect spending objects from the menace of local administrators on the take." "The power to keep a watchful eye on expenditures and on the reliability of those who use public money is bound up with the congressional authority to spend in the first place . . .." 541 U.S. at 608.

The Defendant in the case at bar differentiates between the *work* of a prosecutor's office (the prosecution of criminal cases) and its "business," which he describes as "the

11

range of commercial endeavors which allows the office to do its work - contracting for a workplace, for employees, for equipment, supplies, and other services, and the like." While I certainly agree that corruption of sufficient magnitude in the latter-described activities would fall within the proscription of §666, I reject the proposition that corrupt performance of the *work* of a prosecutor is beyond the reach of the statute. Initially, I would repeat that the definition of "business" relied upon by this defendant includes, in its primary formulation, "a particular occupation or employment habitually engaged in for livelihood or gain." (Defendant's Brief, p. 5). So defined, the term "business" is broad enough to include the exchange of virtually any regularly pursued labor in exchange for pay. The filing and prosecution of criminal litigation on behalf of the people of Michigan is an employment habitually engaged in for livelihood by an elected county prosecutor and his assistants. In my view, it is quite ordinary and natural to consider the prosecution of criminal cases for livelihood as the "business" of a prosecutor. Although it is public service work, the fact that prosecuting is remunerated confers a sufficiently commercial character to warrant the application of the term "business" under the very definition urged by this defendant. Thus, I am satisfied that, if sufficient federal funds are received by the employing entity, and the charged conduct involved "anything of the value of $5,000 or more," a charge under §666 will lie. I agree with the Government that the Defendant's proposed distinction between a prosecutor's *work* and his "business" makes little sense. I would find it more than curious that a bribe in connection with the purchase of office furnishings (and meeting the financial prerequisites of the statute) would warrant federal prosecution, while a bribe in the identical amount in exchange for abandonment of a meritorious prosecution would not. The Government observes that the offense conduct in <u>Salinas</u> was the granting of conjugal

12

visitation to federal prisoners housed in a county jail.  The granting of such visitation is in no sense a commercial act (apart, of course, from the acceptance of a bribe in exchange for it).  The same would be true of the issuance of a threat to use a city's eminent domain authority by the corrupt city councilman as charged in the <u>Sabri</u> case.  Nonetheless, the bribe recipient in each instance was a paid agent of a government entity receiving federal monies.  While it is true that neither the <u>Salinas</u> nor the <u>Sabri</u> opinion specifically addressed the non-commercial nature of the offense conduct, the lack of such discussion does nothing to undermine the Government's position that non-commercial conduct may support prosecution under §666.  In my view, the unspoken acceptance of the proposition that non-commercial activity may support a charge under §666 undermines the Defendant's argument.

Defendant's second argument in support of his Motion to Dismiss Count One of the Second Superseding Indictment is based upon the Grand Jury's designation of the criminal case of <u>People v. Moldowan</u> as "any business, transaction or series of transactions of the Macomb County Prosecutor's Office involving a thing of value of $5,000 or more."  Defendant asserts that the Superseding Indictment "does not set forth a theory of how that valuation was arrived at, or how the jury might do so."  In a nutshell, Defendant argues "that the dollar value of a criminal prosecution is either insufficiently quantifiable or overly speculative."  (Defendant's Brief, p. 10).

The Government interpreted the defense argument as a simple claim that it will be unable to produce evidence of a $5,000 valuation at trial.  Based upon that interpretation, the prosecution maintains that the Motion to Dismiss is merely "an answer to the allegations of the Indictment claiming that those allegations are false and untrue."  (Government Brief,

13

p. 10).  The Government takes the position that its capacity to prove the $5,000 value required by the statute is essentially an issue of fact to be tried by the jury.  (Id.).

Defendant, in his reply brief, denies that his motion merely raises an issue of sufficiency of evidence.  Rather, he reasserts the argument that "*as a matter of law*, the valuation of a 'business, transaction, or series of transactions' which is required by the statute cannot be performed in connection with that which is alleged in the Second Superseding Indictment: the prosecution of a criminal case."  (Defendant's Reply Brief, p. 4).

In support of his argument, Defendant cites district court opinions from Massachusetts and California.  In my view, however, neither is persuasive authority for the proposition he advances.  In United States v. McCormack, 31 F.Supp. 2nd 176 (D. Mass. 1998), the defendant was charged under 18 U.S.C. §666(a)(2) with giving cash payments of $4,000 to a local police officer in exchange for his efforts to keep the police department from investigating various state law offenses.  McCormack moved to dismiss the Indictment on two grounds: (1) that the conduct alleged in the Indictment was not an offense within the scope of §666(a); and (2) that §666(a) is unconstitutional as applied, since it goes beyond the limits of federal jurisdiction.  The Court granted the motion, finding:

> . . . that it fails to meet the '$5,000 value' requirement; and, b) that there is no connection between the conduct at issue - the police favors - and the federal funds, or the federal program to warrant a federal rather than a state prosecution . . ..

31 F.Supp. 2nd 176 at 189.  While the Court did dismiss the Indictment, in part, based upon the failure to meet the $5,000 value requirement, it was because the bribe paid was only $4,000 and not because the intangible consideration for that payment was incapable of

14

accurate valuation.  In fact, Judge Gertner specifically observed that "[w]here the benefit is intangible, one measure [of its worth] could well be the value to the alleged briber."  She cited United States v. Marmolejo, 89 F.3d 1185 (5th Cir. 1996), the Circuit Court decision affirmed in Salinas v. United States, 522 U.S. 52 (1997), for the proposition that "[t]he best measure was what the defendant was willing to pay . . .."  31 F.Supp. 2nd at 182-83.  Without criticizing that analytical approach, the Court simply noted that it would not help the government, since "McCormack allegedly only paid only $4,000 for having the state officials look aside at a number of state offenses."  31 F.Supp. 2nd at 183.  Judge Gertner's observed that the 5th Circuit in Marmolejo "held that the plain language of the statute is clear and specific; it requires that the business, transaction, or transactions involve 'anything' of value of at least $5,000 to some person or entity, but not necessarily from the perspective of the person or entity that actually receives the funds."  31 F.Supp. 2nd at 184.[1]

        In McCormack, the government offered alternative factual formulations in an effort to convince the Court that the $5,000 threshold contained in the statute had been met.  The Court, however, rejected arguments that the requirement could be met by consideration of: (a) the amount of wages the defendant would have lost if his bail were revoked (too speculative); the value to the defendant of being able to continue living with his fiancé and daughter during the months before his trial (too speculative); the value to the public of

---

        [1] Judge Gertner noted further that the Supreme Court in Salinas affirmed the conviction in Marmolejo, concluding that the "expansive" and "unqualified" language of the statue does not require that the bribe must itself involve federal funds or jeopardize the financial integrity of a federal program in order to violate §666(a).  Nonetheless, she considered Salinas "less than clear," and saw in it an intimation that any interpretation of the statue that does not require a federal connection at all could be unconstitutional.  Notwithstanding Salinas, Judge Gertner found the §666 charge against McCormack defective because there was "no connection between the conduct at issue - the police favors - and the federal funds, or the federal program to warrant a federal rather than a state prosecution . . ..  Defendant Marlinga does not appear to be asserting that argument in the instant case.  The issue seems to be resolved by Sabri v. United States, 541 U.S. 600 (2004).

ensuring that police functions are not corrupted, and that the defendant complied with his bail restrictions (too speculative) and the salaries paid to the police officer bribe recipients during the time that the defendant was allegedly attempting to influence and corrupt their actions (too broad - "§666, by this reasoning, would apply to efforts to bribe any police officer, anywhere . . ., for whatever amount."). A discussion of the merits or shortcomings of the Court's reasoning with respect to these alternative formulations is unnecessary here, as no similar argument has been offered by the Government.

The second case cited by the Defendant in support of his valuation argument is United States v. Frega, 933 F.Supp. 1536 (S.D. CA 1996). The defendants in that case were charged with bribery in connection with a twelve year pattern of judicial corruption. During that time, one defendant, Judge Malkus, presided over at least five cases in which Frega appeared as counsel. "Over the same period, Frega allegedly lavished on Malkus such gifts as a $612 health club membership, $9,900 in salary payments to Malkus' son for employment arranged by Frega with a former client, and over $3,500 in car repairs." Another defendant, Judge Adams, presided over all or part of at least seven cases in which Frega appeared. "Over the same period, Frega supposedly paid over $1,700 for a professional writer to ghost write a novel for Adams, gave Adams a $2,000 computer, arranged for a former client to provide (or contributed himself) over $8,000 in car services to Adams and his family, arranged for the former client to sell a car to Adams at $1,000 below cost, contributed $4,000 and $2,200 toward the cost of cars for Adams daughter and father respectively, and paid $614 for a new bed for Adams." 933 F.Supp. at 1538.

16

The Indictment alleged that " . . . more than $100,000 in bribe payments . . . were made and received with the intent to influence and reward California Superior Court Judges in connection with cases in the California State Court System."  933 F.Supp. at 1541.  The Court declared that the Indictment failed to allege that the cases in which the defendant judges were alleged to have exerted their corrupt influence were valued at $5,000 or more.

> This omission appears to be more than a simple technical error, as it is unclear how the United States intends to value the cases that Adams and Malkus presided over.  The Court can conceive of at least three ways in which the cases could be valued: (1) the amount in controversy; (2) the ultimate settlement value or verdict; or (3) the value of the case to Frega.  Nowhere does the Indictment explain the government's theory of valuation.

> Significantly, if §666 is used to prosecute non-federal employees who corruptly administer federal funds, even if federal funds are not directly threatened, there is only one measure of value: the value of the funds corruptly transacted.  See, e.g. United States v. Valentine, 63 F.3d 459, 461-62 (6th Cir. 1995) (transactions were $8,363 misappropriated from copying fees and $7,000 lost wages when employee labor was misappropriated for personal use); United States v. Wyncoop, 11 F.3d 119, 120 (9th Cir. 1993) (transaction was $65,000 in federal student loans); United States v. Simas, 937 F.2d 459, 463 (9th Cir. 1991) (transaction was stair cleaning project worth $5,790); United States v. Westmoreland, 841 F.2nd 572, 575 (5th Cir. 1988) (transactions were purchases of goods worth $14,482.92).

> This ambiguity in calculating the transaction value, combined with the lack of ambiguity in other cases, indicates that the language of the statute is insufficiently clear to determine whether the statute was meant to apply to the situation at hand.

933 F.Supp. at 1541.  Judge Rafeedie was confronted with an Indictment by which the government was attempting to prosecute a succession of gratuities (many less than

$5,000) given over a period of 12 years, allegedly as *quid pro quo* for an unspecified instances of allegedly corrupt influence exerted in at least twelve lawsuits over the same time period.  His frustration is more than understandable.  Not only did the Indictment fail to allege that the cases were valued at $5,000 or more, it provided no way to determine whether any particular case (or action taken within the context of a particular case) could be proven to have the threshold value required for the application of §666.  That is not to say, however, that a lawsuit (or an action taken within a lawsuit) is incapable of valuation.  On the contrary, Judge Rafeedie acknowledged "at least three ways in which the cases could be valued," the last of which was "the value of the case to Frega (the bribe giver)." 933 F.Supp. at 1541.  As discussed above, that method of establishing the value of intangible benefits has been employed in reported cases.  See, <u>Sabri v. United States</u>, 541 U.S. 600 (2004); <u>Salinas v. United States</u>, 522 U.S. 52 (1997).  The problem in <u>Frega</u> appears not to be whether the value of a corrupt act can be established by the amount paid for it, but rather the failure of the government to link any particular act with a payment meeting the statutory threshold.[2]

In the instant case, Count One of the Second Superseding Indictment specifically links a particular item of "business," the criminal case of <u>People v. Moldowan</u>, and a particular "transaction" within that business, the Motion to Permit the Plaintiff-Appellee to Amend Previously Filed Answer to Defendant-Appellant's Delayed Application for Leave to Appeal, with the alleged solicitation/acceptance of contributions and fundraising efforts

---

[2]   Judge Rafeedie also found the §666 charge defective because the Indictment [did] not allege that federal funds were corruptly administered, were in danger of being corruptly administered or even could have been corruptly administered.  In this particular, I find that the decision is simply wrong, in light of the Supreme Court's decision in <u>Salinas v. United States</u>, 522 U.S. 52 (1997).

during a specified period of time.  The Government has alleged that the "business" and/or

"transaction" stated in Count One involved "a thing of value of $5,000 or more."  Whether

the Government can establish the statutory threshold value at trial remains to be seen.  I

am satisfied, however, that an allegedly corrupt act in the prosecution of a lawsuit, like

other intangible considerations, is subject to valuation, and that a payment of $5,000.00 or

more in exchange for that corrupt act is a legitimate method for establishing its value.

Accordingly, I recommend that Defendant's Motion to Dismiss the Second Superseding

Indictment be denied as to Count One.

## COUNT TWO

Title 18 United States Code §1341 provides, in pertinent part, as follows:

**§1341. Frauds and Swindles**

Whoever, having devised or intending to devise any scheme or
artifice to defraud, or for obtaining money or property by means
of false or fraudulent pretenses, representations, or promises,

\*                    \*                    \*

for the purpose of executing such scheme or artifice or
attempting to do so, places in any post office or authorized
depository for mail matter, any matter or thing whatever to be
sent or delivered by the postal service,

\*                    \*                    \*

shall be fined under this title or imprisoned not more than 20
years, or both . . ..

19

Title 18 United States Code §1346 provides as follows:

§1346.  Definition of "Scheme or Artifice to Defraud"

For the purposes of this chapter, the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.

In Count Two of the Second Superseding Indictment in this case, the Government relies upon both sections.  Paragraph 6 of the Second Superseding Indictment alleges that:

[F]rom approximately October, 2001 to January, 2002, in the Eastern District of Michigan, defendant Marlinga knowingly and wilfully devised and intended to devise a scheme to defraud the Michigan Supreme Court and the citizens of Macomb County of their right to his honest services.

Second Superseding Indictment, Paragraph 6.  Defendant challenges Count Two on alternative grounds.  First, he maintains that his ethical obligations to correctly state the record before a Court do not constitute "honest services," within the meaning of §1346. Second, he maintains that the alleged misstatement described in the charge is insufficiently material to constitute a violation of §646 (or a violation of Rule 33(a)(1) of the Michigan Rules of Professional Conduct).

1.  "Honest Services"

There is no doubt that Count Two of the Second Superseding Indictment charges that Defendant, as the elected prosecuting attorney for Macomb County, devised a scheme to defraud both the Michigan Supreme Court and the citizens of his County "of their right to his honest services . . .."  (Superseding Indictment, Count II, Paragraph 6 (emphasis added)).  Further, the Government has clearly stated its position that "[a]lthough the Indictment is cast in terms of the conjunctive, a guilty verdict may be based on a jury

determination that the defendant is guilty of intending to defraud <u>either</u> the Court <u>or</u> his constituents. (Government's Brief, page 11, footnote 4 (emphasis added)). The Government relies upon the holding of <u>United States v. Hathaway</u>, 798 F.2d 902, 912-13 (6th Cir. 1986) that an impermissible variance from an Indictment does not occur when several acts are charged in the conjunctive, but a district court charges the jury in the disjunctive. The Court in <u>Hathaway</u>, however, relied on <u>United States v. Miller</u>, 471 U.S. 130 (1985), in which the Supreme Court noted that the doctrine was "premised on the notion that each offense whose elements are fully set out in the Indictment can independently sustain a conviction."

In this case, Defendant contends that Count Two is defective because "the ethical obligations which Mr. Marlinga (in common with all other attorneys) admittedly owed the Michigan Supreme Court (and all other courts) can not properly be characterized as 'services' within the meaning of 18 U.S.C. §1346." (Defendant's Brief, page 12).

Defendant concedes that Michigan Rule of Professional Conduct ("MRPC") 3.3(a)(1) prohibits a lawyer from knowingly making a false statement of material fact or law to a tribunal. He correctly observes that the Rule is binding upon all lawyers, and that his obligation to comply with it stems from his professional status as an attorney, and not as a consequence of his status as Prosecuting Attorney. Defendant asserts that the sole basis stated for mail fraud liability in Count Two is his alleged violation of MRPC 3.3(a)(1). He argues that a charge founded on that basis "constitutes an untoward extension of the mail fraud statute." (Defendant's Brief, p. 13).

Defendant maintains that MRPC 3.3(a)(1) "does not define the contours of a lawyer's 'honest service' to the Courts, including the Michigan Supreme Court." <u>Id</u>. He

21

contends that the Rule simply imposes *duties* to the Court which an attorney must fulfil in the course of rendering his *services* on behalf of his client.  Defendant further maintains that Rule 3.3(a)(1) "defines an attorney's duty to the Court, *not* to his client", and that the Superseding Indictment sets forth no provision of State law which creates such a duty (to the client).  Id.  I agree with the first proposition, and disagree with the second.

I agree with Defendant that MRPC 3.3(a)(1) vests no right in the Michigan Courts to the "honest services" of the attorneys who practice before them.  Mr. Marlinga, in common with all licensed attorneys in this State, clearly owed a duty of candor toward the Courts under the Rule.  The fulfilment of that duty, however, does not constitute the rendering of "services" to the Courts, but is, rather, a qualification of the advocate's obligation to present each client's case with persuasive force (i.e., to render "services" to the client).  (See, Comments following MRPC 3.3, Paragraph 1).  A Michigan lawyer's obligation in rendering services to his client is further qualified by MRPC 3.4 which imposes a duty of fairness to opposing counsel and parties.  While the duty is real, its fulfilment cannot sensibly be interpreted as the rendering of "service" to his client's opponent.  It is, instead, simply a limitation to be observed in the course of rendering service to the client whose interests he advocates.  In similar fashion MRCP 3.8 imposes special responsibilities upon the prosecutor in a criminal case.  Nothing in that rule, however, imposes a duty of "service" to the Court before which the action is litigated.

The Government's theory that MRPC 3.3(a)(1) vests every Michigan Court with an independent, free standing right to the "honest services" of the lawyers who practice before it would, in my view, permit an unprecedented extension of federal authority under 18 U.S.C. §1346.  Typically, an attorney has a direct financial interest in the success of his

arguments before a Court, "not only for the present fee but to insure that he will continue to be employed as counsel in the future."  United States v. Bloom, 149 F.3d 649, 658 (7th Cir. 1998) (J. Bauer, dissenting).  Intuitively, it follows that a purposeful misstatement of fact in a brief submitted to a Court would be intended to achieve success, and thus serve the attorney's commercial interest.  This is true even as to elected prosecutors, for whom success in litigation enhances re-election prospects.  Under the Government's theory that the submission of a brief on behalf of a client is a "service" to the Court, the mailing of a deceptive brief in violation of MRPC 3.3(a)(1) would in every case satisfy all of the elements of "honest services" mail fraud under Title 18 U.S.C. §§1341 and 1346.  I find it inconceivable, however, that the intent of §1346 was to incorporate state rules of professional conduct into the federal criminal code.  Nothing in the cases or argument presented by the Government would support that conclusion.

The Government relies upon United States v. Frost, 125 F.3d 346, 363 (6th Cir. 1997), in which our Circuit Court observed that "[t]he classical application of the intangible right to honest services doctrine has been applied to a corrupt public servant who has deprived the public of his honest services."  (Emphasis added).  The Frost opinion cited United States v. Brumley, 116 F.3d 728 (5th Cir. 1997) for the proposition that §1346 applies to "government entities, and that the right to 'honest services' includes the right to 'honest and impartial government.'"  Frost, 125 F.3d at 364.  The prosecution correctly observes that the Courts in Frost and Brumley were concerned about the potential scope of the duty to render honest services.  They recognized that broad application of the statute could criminalize a wide range of conduct not traditionally viewed as mail fraud.  The defendants in Frost were private citizens employed by a state university.  The Court

23

determined that, as a matter of federal law, the defendant professors owed a fiduciary duty to protect the property of their university employer, and that their breach of that duty for personal gain was a proper basis for prosecution under §1346.  In so finding, the Court recognized that "the literal terms of the 'intangible right to honest services' doctrine do not indicate that the prosecution must prove that a fiduciary breach has created a risk of economic harm to the employer."  The Court, however, engrafted such a requirement on to the statute, based upon its perception of "a need to avoid the over-criminalization of private relationships . . .."  Frost, at 368.  Thus, our Circuit has recognized a judicial responsibility to keep the application of §1346 within reasonable bounds.  Other circuits have recognized this judicial role as well.

> No one can be sure how far the intangible rights theory of criminal responsibility really extends, because it is a judicial gloss on §1341.  Congress told the Courts in §1346 to go right on glossing the mail fraud and wire fraud statutes along these lines.  Given the tradition (which verges on constitutional status) against common law federal crimes, and the rule of lenity that requires doubts to be resolved against criminalizing conduct, it is best to limit the intangible rights approach to the scope it held when the Court decided (and Congress undid) McNally.  An employee deprives his employer of his honest services only if he misuses his position (or the information he obtained in it) for personal gain.

United States v. Bloom, 149 F.3d 649, 656-57 (7th Cir. 1998).

In my view, the Frost decision does not support the Government's effort to premise §1346 liability on the theory that Defendant Marlinga breached a fiduciary duty to the Michigan Supreme Court.  Although the language of Frost is extremely broad (". . . [I]ndividuals . . . may commit mail fraud by breaching a fiduciary duty and thereby depriving the person or entity to which the duty is owed of the intangible right to the honest services

24

of that individual"), the case dealt with the conduct of <u>employees</u> who breached a fiduciary duty to the university <u>employer</u> which had the right to their honest <u>services</u>.  I agree with Defendant that the concepts of "duty" and "services" are separate and distinct, and that the right to honest services connotes more than a duty.  It requires a master-servant or agent-principal relationship which does not exist between a court and the attorneys who practice before it.

Courts analyzing the sweep of §1346 have reached similar conclusions in cases involving misconduct by public officials.

> Under the most natural reading of the statute, a federal prosecutor must prove that conduct of a state official breached a duty respecting the provision of <u>services owed to the official's employer</u> under State law.  Stated directly, the official must act or fail to act contrary to the requirements of his <u>job</u> under State law.
>
> *          *          *
>
> Stated another way, "honest services" contemplates that in rendering <u>some particular service or services</u>, the Defendant was conscious of the fact that his actions were something less than in the best interests of his <u>employer</u> - or that he consciously contemplated or intended such actions.

<u>United States v. Brumley</u>, 116 F.3d 728, 734 (5th Cir. 1997) (emphasis added).  In every federal case cited by the Government, the prosecution theory of liability under §1346 is based upon the violation by a defendant of an official or fiduciary duty owed to his employer.  I find no case in which liability under the statute is imposed by reason of the violation of a duty to a third party to whom no actual "services" were due.  The legal profession, like many others, is licensed and regulated by authorities other than those to whom the licensees render services.  I find it difficult to imagine that Congress intended

25

§1346 to expose lawyers, physicians, teachers, commercial pilots, cab drivers, electricians, automobile mechanics or plumbers (who use the mail service) to federal criminal liability for intentional ethical or regulatory violations independent and regardless of the effect of their conduct upon the consumers of their skills.

Not only do I find the Government's attempt to employ §1346 to punish a lapse of duty to a non-employing entity unwarranted, I find it unnecessary in this case. There is little question that the Defendant owed a duty of honest services to Macomb County and the people of the State of Michigan by whom he was employed. The Government has properly cited numerous cases enunciating the principle that a prosecuting attorney owes professional, fiduciary and ethical duties to the people he serves, both the innocent and the guilty. MRPC 3.3 removes any doubt that a duty of honesty is among them. The use of the mails to facilitate an intentional breach of that duty quite clearly deprives a prosecuting attorney's constituents of the intangible right to his honest services. I am fully satisfied that Count Two of the Second Superseding Indictment presents that very accusation, and that proof beyond reasonable doubt of the factual allegations relating to the right of the citizens of Macomb County to Defendant's honest services would support conviction.

Where a mail fraud count alleges only one instance of the use of the mail in furtherance of multiple schemes (or a single scheme with multiple objects), the count is not duplicitous. A jury may find the Defendant guilty of only one mail fraud offense on that count, regardless of whether it finds that the Defendant devised one or all of the alleged schemes associated with that particular use of the mail. United States v. Caldwell, 302 F.3d 399, 408 (5th Cir. 2002). Where one of alternative bases of criminal liability stated in

26

a single count is insufficient as a matter of law, however, a general verdict of guilty may not stand.  In <u>Yates v. United States</u>, 354 U.S. 298 (1957) a defendant had been charged in a single count of conspiracy which asserted three separate objects, and the jury rendered a general guilty verdict.  The Supreme Court ultimately found that one of the three alleged objects was insufficient in law to support a conviction.  The Court rejected the Government's argument that the verdict should stand on the basis of one of the remaining objects.  "In these circumstances we think the proper rule to be applied is that which requires a verdict to be set aside in cases where the verdict is supportable on one ground, but not another, and it is impossible to tell which ground the jury selected."  354 U.S. at 311-12.

In <u>Griffin v. United States</u>, 502 U.S. 46 (1991) the Court rejected an effort by the defendant to set aside a general verdict because one of possible alternative bases of conviction was not supported by sufficient evidence.  In writing for the majority, Justice Scalia emphasized the distinction between legal insufficiency, which was the basis for reversal in <u>Yates</u>, and insufficiency of proof which the Court later held not to be a basis for reversal if the evidence as to an alternative basis for criminal liability was sufficient.  See, <u>Turner v. United States</u>, 396 U.S. 398 (1970).

> That surely establishes a clear line that will separate <u>Turner</u> from <u>Yates</u>, and it happens to be a line that makes good sense. Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law - whether, for example, the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime.  When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error.  Quite the opposite is true, however, when they have been left the option of relying

27

upon a factually inadequate theory, since jurors *are* well equipped to analyze the evidence. See <u>Duncan v. Louisana</u>, 391 U.S. 145, 157, 88 S.Ct. 1444, 1451, 20 L.Ed. 2nd 491 (1968). As the Seventh Circuit has put it: "it is one thing to negate a verdict that, while supported by the evidence, may have been based on an erroneous view of the law; it is another to do so merely on the chance - remote, it seems to us - that the jury convicted on a ground that was not supported by adequate evidence when there existed alternative grounds for which the evidence was sufficient." <u>U.S. v. Townsend</u>, 924 F.2d 1385, 1414 (1991).

502 U.S. at 59-60.

I am satisfied that the Government's prosecution theory against this Defendant under 18 U.S.C. §§1341 and 1346 for violation of the Michigan Supreme Court's right to his honest services is insufficient in law. A general verdict of guilty on Count Two of the Indictment as presently framed would not be supportable, even if the evidence in the case was sufficient to support a finding of guilt on the theory that Defendant deprived his constituents of their right to his honest services. Further, I conclude that the language of the Indictment suggesting that the Michigan Supreme Court had a right to Defendant's honest services is prejudicial, as it tends to vilify Defendant by the assertion of the violation of a right to services that does not exist.

In <u>Ford v. United States</u>, 273 U.S. 593 (1927), the Supreme Court held that language in an Indictment which failed to make out an offense against the laws of the United States "is merely surplusage and may be rejected." The Court upheld the conviction of the Defendants in a case in which the trial court took that view, and other language in the Indictment was sufficient to state an offense. In <u>United States v. Miller</u>, 471 U.S. 130 (1985), Justice Marshal cited <u>Ford</u> approvingly in a case holding that it does not constitute an unconstitutional amendment of an Indictment to drop language which is unnecessary

28

to an offense that is clearly contained within it.  Federal Rule of Criminal Procedure 7(d) permits the Court, upon a defense motion, to strike surplusage from an Indictment or Information.  "The striking of language from an Indictment as being surplusage addresses itself to the sound discretion of the district court.  The granting of such a motion is proper, however, only where the words stricken are not essential to the charge."  United States v. Kemper, 503 F.2d 327, 329 (6th Cir. 1974), cert. denied, 95 S.Ct. 810 (1975).  Recognizing that the evidence upon which the Government will rely will be the same whether Defendant is tried on one or both of the "honest services" mail fraud theories contained in Count Two, I conclude that the Court should strike the language in paragraphs 3, 6 and 8[3] of that Count which alleges an independent right of the Michigan Courts, and the Michigan Supreme Court in particular, to the services of the Defendant.  Because such language is unnecessary to the charge of "honest services" mail fraud against the defendant's constituents, which is clearly contained in Count Two, the striking it would not constitute an unconstitutional amendment to the Indictment.  United States v. Miller, 471 U.S. 130, 144-45 (1985).  Defendant should be afforded the opportunity to file a motion under Fed.R.Crim.P. 7(d) to challenge any additional portions of Count Two which support only the proposition that he owed services to the Michigan Courts within the meaning of §1346.

   2.    **"Materiality"**

   Defendant also challenges the sufficiency of Count Two of the Second Superseding Indictment on the theory that the passage in his brief to the Michigan Supreme Court which the Government characterizes as dishonest was not "material," as required by the Mail

---

[3]  The precise language to be stricken is highlighted on Exhibit A, attached.

Fraud Statute and MRPC 3.3. The Government responded to the challenge in a footnote. (Government's Brief, p. 21-22, n.11). The note expresses doubt, based on the holding in Frost, that materiality is an element of an honest services fraud prosecution. Alternatively, on the assumption that a showing of materiality is required under §1341, the Government maintains that its existence would be a factual question for the jury, and that the Defendant's challenge is not an appropriate ground for a pretrial Motion to Dismiss an Indictment.

In Neder v. United States, 527 U.S. 1, 24-25, (1999) the Supreme Court held that "materiality of falsehood is an element of the Federal Mail Fraud, Wire Fraud and Bank Fraud Statutes." In that case, the defendant challenged his conviction based upon the trial Court's failure to charge the jury that materiality was an element of mail fraud and wire fraud charges. The district court judge had determined that materiality was not a question for the jury and found that the evidence had in any event sufficiently established the necessary element. The Eleventh Circuit Court of Appeals affirmed the conviction, holding that materiality is not an element of a "scheme or artifice to defraud" under the Mail Fraud, Wire Fraud and Bank Fraud Statutes, and that the District Court did not err in failing to submit the issue to the jury. The Supreme Court reversed, finding that the trial court's omission of materiality as an element of the offenses in its charge to the jury was error. The case was remanded to the Court of Appeals with instructions that it should consider in the first instance whether the jury instruction error was harmless.

On remand, the Eleventh Circuit determined that the trial court's omission of the issue of materiality from its jury instructions was harmless error, since the Government demonstrated that the evidence of materiality was so overwhelming that no rational jury,

30

properly instructed on the element of materiality, could have acquitted the defendant. The Circuit Court applied the Supreme Court's instruction that a false statement is material, for purposes of a fraud prosecution, if it has "a natural tendency to influence or [is] capable of influencing, the decision of the decision making body to which it was addressed." 197 F.3d 1122, 1128 (1999). Accordingly, I am satisfied that Defendant is correct in his contention that materiality is an element of the offense of mail fraud. I agree with the Government, however, that whether Defendant's alleged misrepresentations to the Michigan Supreme Court in the case of People v. Jeffrey Moldowan were material is an issue for the jury.

Defendant cites 11th Circuit case law for the proposition that a scheme to defraud has not been proved where a reasonable juror would have to conclude that the representation is about something which the [person to whom it is directed] should, and could, easily confirm. (Defendant's Brief, p. 16, citing United States v. Brown, 79 F.3d 1550, 1559 (11th Cir. 1996)). He suggests that the full record in the Moldowan case was available to the Michigan Supreme Court, and that the Justices could have nullified the effect of Defendant's misrepresentation by simply reviewing it. Defendant further argues that the characteristics of the witnesses described in the allegedly false statement were not "the dispositive issue before the Supreme Court." The first argument, I believe, underestimates the level of trust and reliance which Courts traditionally confer upon the factual representations of attorneys in the course of litigation. The very purpose of MRPC 3.3 is to promote, and thus render reasonable, that judicial confidence. Defendant also overlooks the fact that a brief, by its very nature, is an instrument of persuasion whose sole purpose is to affect the judgment of the tribunal to which it is submitted. Finally, I would observe that factual representations in attorneys' briefs are not universally supported (or

31

contradicted) by the case record.  Giving due respect to Defendant's first argument, I conclude that a finding of immateriality as a matter of law at this juncture is unwarranted.

As for Defendant's second argument (that the characteristics of the witnesses were not dispositive in the Michigan Supreme Court's decision), I find that it is misplaced.  The decisions in <u>Neder</u> at both the Supreme Court and Circuit Court levels, make it clear that actual reliance is not an essential element of a mail fraud conviction.  <u>Neder v. United States</u>, 527 U.S. 1, 24-25 (1999) ("The common law requirements of 'justified reliance' and 'damages' . . . plainly have no place in the federal fraud statutes."); <u>United States v. Neder</u>, 197 F.3d 1122, 1128 (1999) ("Because the issue is whether a statement has a tendency to influence or is capable of influencing a decision, and not whether the statement exerted actual influence, a false statement can be material even if the decision maker did not actually rely on the statement.").  "Indeed, a false statement can be material even if the decision maker actually knew or should have known that the statement was false."  <u>Id</u>. (Citing <u>United States v. Johnson</u>, 139 F.3d 1359, 1364 (11th Cir. 1998), <u>cert. denied</u>, 527 U.S. 1021 (1999).  I am satisfied that Defendant's materiality argument is insufficient to warrant dismissal of Count Two.

## **COUNT THREE**

Defendant's challenge to Count Three of the Second Superseding Indictment is premised upon the identical grounds asserted in connection with Count One.  Based upon the analysis set forth above as to Count One, I recommend that the Motion to Dismiss be denied as to Count Three.

**<u>COUNT FOUR</u>**

Defendant moves to dismiss Count Four of the Second Superseding Indictment on the ground that the wire transmission of the Federal Election Commission Report Form F3N, detailing contributions received by Carl Marlinga for Congress for the periods May 1, 2002 to June 30, 2002 will not support the Government's claim of criminal liability "because it cannot fairly be said to have been (and the Indictment does not even allege that it was) 'in furtherance' of the supposed scheme." (Defendant's Brief, p. 18). Defendant cites <u>United States v. Hartsel</u>, 199 F.3d 812, 815-16 (6th Cir. 1999) for the proposition that the use of the mail or wire service must be "in furtherance" of the alleged scheme to defraud. He reasons that "the *only* conceivable connection [the FEC Report] might have had with the allegations of a scheme to defraud in relation to [*People v. Hulet*] is the allegation contained in paragraph 10 of Count Four that one of Mr. Marlinga's purposes 'was to conceal, on a Federal Election Commission Disclosure Report, [Hulet's] attorney's identity as a contributor of $4,000.00." (Defendant's Brief, p. 19). Defendant reasons that, because he had already received and reported contributions from the attorney in question, the electronic submission identified in Count Four "was, truly, merely incidental, and cannot support the charge of wire fraud." <u>Id</u>.

The Government counters that defense counsel "appears not to have understood the theory of Count Four . . .." The prosecution relies upon <u>United States v. Frost</u>, 125 F.3d 346, 354 (6th Cir. 1997) for the principle that the use of an interstate communication facility need only be closely related to a scheme to defraud, and reasonably foreseeable as a result of the defendant's conduct. The Government posits that the allegedly false wire transmission to the FEC satisfies that standard because it "was necessary to disguise

Hulet's attorney's contributions beyond the amount permitted by law, and was thus 'closely related to the scheme' of Marlinga taking improper action in the *Hulet* case in exchange for large campaign contributions. I agree with the Government position.

The essence of the "scheme to defraud" alleged in Count Four is the exchange of conduct by Defendant "to further the personal interests of the attorneys and criminal defendant in the case of *People v. Hulet* and the corresponding civil action in return for campaign contributions and fund raising activity." (Second Superseding Indictment, Count Four, Paragraph 3). Because of legal limitations on the amount of campaign support which he could accept from an individual contributor, Defendant and Hulet's counsel, according to the Indictment, arranged for contributions in excess of the legal limit to be disguised by falsely attributing them to donors other than Hulet's counsel. (Second Superseding Indictment, Count Four, Paragraphs 4-14). The last rhetorical paragraph of Count Four alleges that Defendant utilized wire transmission facilities of interstate commerce "detailing contributions purportedly received by Carl Marlinga for Congress" for the time period encompassing the allegedly disguised excessive contributions. I am persuaded that the Indictment makes out a sufficient allegation of wire fraud. A wire transmission for the purpose of concealing the true source of illegal campaign contributions received in exchange for corrupt assistance by a prosecuting attorney to the defense (allegedly to the detriment of his constituents' interests) in a criminal case is certainly "in furtherance of the scheme" to trade improper official conduct for improper campaign support. The Government theory that "the false wire transmission . . . was necessary to disguise Hulet's attorneys' contributions beyond the amount permitted by law," and thus was "closely related to the scheme" of Marlinga taking improper action in the *Hulet* case in exchange for large

34

2:04-cr-80372-VAR-DAS   Doc # 133   Filed 06/09/06   Pg 35 of 37   Pg ID 1168

campaign contributions (Government's Brief, page 23) is plausible.  The obvious necessity

for a disguise is to prevent discovery or identification.  The very authority relied upon by

Defendant, <u>United States v. Hartsel</u>, supports the Government's view.

> In other words, for a mailing to be in furtherance of a scheme,
> the scheme's completion <u>or</u> <u>prevention</u> <u>of</u> <u>its</u> <u>detection</u> must
> have depended in some way on the charged mailing.

199 F.3d at 816 (citing <u>United States v. Henson</u>, 848 F.2d 1374, 1378 (6th Cir. 1988), <u>cert.</u>

<u>denied</u>, 488 U.S. 1005.  (Emphasis added).  The Seventh Circuit has also held that the

falsification and mailing of a required annual report in order to "keep a lid" on a kickback

scheme could be seen by a sensible jury as "integral to the scheme" so as to violate §1341.

<u>United States v. Geneva</u>, 333 F.3d 750, 759 (7th Cir. 2003).  There is no doubt that the

same legal standards apply under both the mail fraud (18 U.S.C. §1341) and wire fraud (18

U.S.C. §1343) statutes with respect to the requirement for the use of an interstate facility

"for the purpose of executing such scheme or artifice."  See, <u>United States v. Bibby</u>, 752

F.2d 1116, 1125-26 (6th Cir. 1985).  I am fully satisfied that the facts alleged in Count Four

of the Second Superseding Indictment, if proved beyond reasonable doubt, will support a

conviction. Accordingly, I recommend that the Defendant's Motion to Dismiss be denied as

to Count Four.

## <u>COUNTS FIVE AND SIX</u>

Defendant's Motion to Dismiss Counts Five and Six of the Second Superseding

Indictment were previously addressed to this Court in connection with his Motion to Dismiss

the earlier Indictment, which contained the same charges against this Defendant.  The

substance of his arguments is not repeated in the current motion.  The renewed challenge

simply incorporates the arguments previously advanced, and rejected by the Court, so as

to preserve them for purposes of appeal.  As the Court has previously ruled on each of the arguments, and Defendant has added nothing to them, no further analysis is required.  I recommend that Defendant's Motion to Dismiss Counts Five and Six of the Second Superseding Indictment be denied for the reasons stated by the Court in response to the earlier motion.

## III.    NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. Section 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  United States v. Walters, 638 F.2d 947 (6th Cir. 1981), Thomas v. Arn, 474 U.S. 140 (1985), Howard v. Secretary of HHS, 932 F.2d 505 (6th Cir. 1991).  Filing of objections that raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  Smith v. Detroit Federation of Teachers Local 231, 829 F.2d 1370, 1373 (6th Cir. 1987), Willis v. Secretary of HHS, 931 F.2d 390, 401 (6th Cir. 1991).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall not be more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The

response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Donald A. Scheer
DONALD A. SCHEER
UNITED STATES MAGISTRATE JUDGE

DATED: June 9, 2006

_____

**CERTIFICATE OF SERVICE**

I hereby certify on June 9, 2006 that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically. I hereby certify that a copy of this paper was mailed to the following non-registered ECF participants on June 9, 2006. **None.**

s/Michael E. Lang
Deputy Clerk to
Magistrate Judge Donald A. Scheer
(313) 234-5217