**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**UNITED STATES,**

                **Plaintiff(s),**          **CASE NUMBER: 04-80372**
                                       **HONORABLE VICTORIA A. ROBERTS**

**v.**

**CARL MARLINGA,**

                **Defendant(s).**
_____/

**ORDER ON DEFENDANT'S MOTION**
**TO DISMISS SECOND SUPERCEDING INDICTMENT**

**I.       INTRODUCTION**

This matter is before the Court on Defendant Carl Marlinga's Motion to Dismiss the Second Superseding Indictment.  The matter was referred to Magistrate Judge Donald A. Scheer for a Report and Recommendation, pursuant to 28 U.S.C. §636(b)(1)(B).  Judge Scheer recommends that Defendant's motion be **GRANTED IN PART** and **DENIED IN PART**.  The Court **ADOPTS** the Report and Recommendation except with regard to the Magistrate's conclusion on Count II.  The Court dismisses Count II.

**II.      BACKGROUND**

Defendant is the former Macomb County Prosecuting Attorney.  In a six-count Second Superceding Indictment, he is charged with bribery (Counts I and III), mail fraud (Count II), wire fraud (Count IV), false statement to an agency of the United States

1

(Count V), and exceeding limitations on contributions, procuring, commanding and counseling (Count VI).  The charges against him stem from alleged campaign contribution improprieties during his unsuccessful bid in 2002 for election to the United States House of Representatives.  A full summary of the allegations against Defendant were set out in detail in the Court's prior orders and are only restated here to the extent necessary to address Defendant's motion.  *See* Opinion and Order Regarding Motions to Dismiss*,* February 28, 2005.

Defendant requests dismissal of each Count of the Second Superceding Indictment.  Magistrate Scheer recommends that the Court deny Defendant's motion on Counts I, III, IV, V and VI, but that it grant Defendant's motion in part on Count II by striking certain language in paragraphs 3, 6 and 8 of the Second Superceding Indictment.  Defendant filed timely objections to Magistrate Sheer's recommendation.  A hearing was held on the objections on July 24, 2006.

## III.   ANALYSIS

### A.    COUNTS I AND III--BRIBERY IN VIOLATION OF 18 U.S.C. §666

18 U.S.C. §666 states in relevant part that:

(a) Whoever, if the circumstance described in subsection (b) of this section exists--

(1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof--

* * *

(B) corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more;

2

* * *

shall be fined under this title, imprisoned not more than 10 years, or both.

(b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

In Counts I and III, the Government alleges that Defendant violated §666 by accepting, and agreeing to accept, contributions and promises of fundraising efforts on his behalf in exchange for favorable official acts by Defendant in two Macomb County Circuit Court criminal cases--*People v Moldowan* and *People v Hulet*. The Government asserts that the "business, transactions or series of transactions" upon which each count is based are Defendant's alleged acts in the criminal cases. However, Defendant argues that: 1) criminal prosecutions are not "business, transactions or series of transactions" within the meaning of the statute, because they are not the kind of business affairs contemplated by the statute, and 2) the Government cannot establish that his alleged acts had a value of at least $5,000 because the value of criminal prosecutions is either unquantifiable or speculative. Magistrate Scheer recommends that the Court reject each argument.

### i.    Scope of the Statute

Defendant points out that the terms "business" and "transaction" are not defined in the statute and, therefore, must be given their "ordinary and natural" meaning.   *See Limited, Inc. v C.I.R.,* 286 F.3d 324, 332 (6th Cir. 2002)("When the text of a statute

3

contains an undefined term, that term receives its ordinary and natural meaning.").  And,

Defendant argues that those terms as commonly defined refer strictly to commercial

relations or dealings.  For instance, Defendant cites the American Heritage Dictionary's

definition of "transaction" as "[s]omething transacted, especially a business agreement

or exchange."  The American Heritage® Dictionary of the English Language (4th ed.

2000).

Defendant further asserts that "case law generally recognizes that the term

'business' connotes a commercial enterprise."  Def. Motion at p. 5.  He bases this

assertion on the Supreme Court's statement in *Hartford Fire Ins. Co. v California*, 509

U.S. 764, 781 (1993), that the term "is most naturally read to refer to '[m]ercantile

transactions; buying and selling; [and] traffic.'" (citation omitted).  Defendant contends

that this commonly understood meaning is demonstrated by the fact that the

Government's use of the term (as applying to noncommercial matters) is recognized in

Black's Law Dictionary as merely an extension of the core meaning of the word:

> business. 1. A commercial enterprise carried on for profit; a particular
> occupation or employment habitually engaged in for livelihood or
> gain.  2. Commercial enterprises <business and academia often
> have congruent aims>.  3. Commercial transactions <the company
> has never done business in Louisiana>. . . . 4. ***By extension,
> transactions or matters of a noncommercial nature <the courts'
> criminal business occasionally overshadows its civil business>***.
> 5. *Parlimentary Law*.  The matters that come before a deliberative
> assembly for its consideration and action, or for its information with a
> view to possible action in the future.  In senses 2,3 and 4, the word is
> used in a collective meaning.

Black's Law Dictionary 211 (8th ed. 2004)(first emphasis added).   When this extended

definition is employed, Defendant says that one cannot say that the term is being used

in accordance with its ordinary and natural meaning.  Consequently, Defendant argues

that it would be inappropriate to interpret §666 as including the extended definition.

Defendant also contends that the legislative history and purpose of the statute

suggest that the drafters intended that it only be applied to commercial endeavors of

governmental entities.  In support, he cites a report of the Senate Judiciary Committee

discussing §666's proposed enactment:

> [The section was] designed to create new offenses to augment the
> ability of the United States to vindicate significant acts of theft, fraud,
> and bribery involving Federal monies that are disbursed to private
> organizations or State and local governments pursuant to a Federal
> program.

Def. Motion at p. 6 (*quoting* S. Rep. No. 225, 98th Cong., 2d Sess. 369 (1984), reprinted

in 1984 U.S.C.C.A.N. 3510).  Additionally, the Ninth Circuit in *United States v Cabera*,

328 F.3d 506, 508 (9th Cir. 2003), *cert. den.,* 541 U.S. 1064 (2004), described §666 as

"a broad statute designed to protect the *financial* integrity of programs receiving federal

funding." (emphasis added).

In contrast to the commercial connotation that Defendant contends should be

given to the terms "business" and "transaction," Defendant argues that prosecution of

criminal cases is noncommercial in nature.  Defendant says that:

> While the prosecution of criminal cases may be the *work* of a
> prosecutor's office, it is not, other than in a colloquial sense, or "by
> extension," its "business."  Its "business," rather, consists of the
> range of commercial endeavors which allow the office to do its work -
> contracting for a workplace, for employees, for equipment, supplies,
> and other services, and the like.

Def. Motion at p. 7.  Defendant argues that a broad interpretation of "business" and

5

"transaction" to include criminal prosecutions would improperly expand federal power

beyond the bounds intended:

> [T]he federal nexus identified by Congress - and the constitutional
> provision under which the legislation sounds - is in regard to the
> expenditure of funds and the "transaction" of "business."  To extend
> the reading or application of the statute to noncommercial
> "transactions," official acts which cannot be fairly characterized as
> the doing of commercial "business," would improperly expand the
> reach of the statute, and extend federal power beyond its intended
> bounds.

*Id* at p. 8.

The Magistrate rejects Defendant's arguments on two primary grounds.  The

Magistrate asserts that 1) Defendant's reliance upon *Hartford* is misplaced, and 2) there

is support for a broad interpretation of "business" which encompasses the prosecution

of criminal cases.

The Magistrate points out that *Hartford* interpreted the term "business" only as it

was used in the phrase "the business of insurance" in Section 2(b) of the McCarren-

Ferguson Act, 15 U.S.C. §1012(a).  Indeed, the *Hartford* Court stated that, "'business'

*as used in §2(b)* is most naturally read to refer to '[m]ercantile transactions; buying and

selling; [and] traffic.'" (emphasis added, citation omitted).  In light of the narrow context

in which the *Hartford* Court interpreted the term, the Magistrate finds that it is unlikely

that the Court intended that its interpretation would apply in all statutory contexts.  This

Court agrees that there is no basis for the broad application of *Hartford* advocated by

Defendant.

The Magistrate next asserts that both the first and fourth definitions of "business"

set forth in Black's Law Dictionary support a broad interpretation of the term to include criminal prosecutions. The first definition includes "a particular occupation or employment habitually engaged in for livelihood or gain." Black's Law Dictionary at 211. The Magistrate contends that the prosecution of criminal cases by an elected county prosecutor indisputably constitutes employment habitually engaged in for livelihood or gain. Therefore, the Magistrate reasons that the remuneration a prosecutor receives for his work confers a sufficiently commercial character to such work, and that it is "ordinary and natural" to consider prosecution for livelihood as the "business" of the prosecutor.

The Magistrate also contends that the fourth Black's definition--which extends the definition of "business" to noncommercial transactions or matters--is so widely accepted that it is an "ordinary and natural" meaning of the word. For example, the Magistrate points out that police, prosecutors and judges routinely use the terms "police business," "government business," and "court business" to refer to work routinely performed in investigating, litigating and adjudicating criminal cases.

The Magistrate asserts that case law also supports a broad interpretation. Specifically, the Second Circuit in *United States v Bonito*, 57 F.3d 167 (2nd Cir. 1995), broadly interpreted the term "business" as it is used in §666, albeit in a different context:

> "Business ," broadly defined includes "work," "professional dealings," "one's proper concern," and "serious work or endeavor that pertains to one's job."

57 F.3d at 172 (*quoting* American Heritage Dictionary 180 (1973)). The Magistrate notes that the *Bonito* Court ultimately limited its definition of the term to "the dealings of a government official in connection with a discrete transaction," while also finding that

7

"transaction" implies a concluded business agreement. *Id* at 173 (*citing* American Heritage Dictionary 1362 (1973)).   The *Bonito* Court also left open the question of the reach of §666 when corrupted business does not directly implicate an organization's federal funds or financial interests.

Nevertheless, the Magistrate asserts that, the breadth of §666 is similarly demonstrated in *Salinas v United States*, 522 U.S. 52 (1997), and *Sabri v United States,* 541 U.S. 600 (2004).  Defendant contends that in both of these cases, there was a commercial element to the conduct underlying the bribe.  In *Salinas*, for instance, prison officials allowed prohibited contact visits to occur in prison facilities in which the federal government issued grants for improvement and paid the county a certain amount per day for each federal prisoner housed.

In *Sabri*, the defendant paid bribes to city officials so that he could have meetings with individuals who would facilitate his desire to get federal funding for economic development in the city.

At issue in both cases was whether there was a sufficient nexus between the federal funds and the alleged bribes--a challenge not made by this Defendant.  Rather, Defendant here contends that §666 is not intended to pertain to noncommercial transactions such as criminal prosecutions.

The Magistrate Judge concedes that neither Court addresses the noncommercial nature of the offense conduct.  Nonetheless, he concludes that the lack of such discussion does not undermine the Government's position that noncommercial conduct may support prosecution under §666.

8

Defendant contends that the Magistrate's reliance upon *Salinas, Sabri* and *Bonito* is misplaced. He argues that none of those cases addresses the issue he raises: that noncommercial transactions are not within §666's reach.

Second, Defendant asserts that the Magistrate failed to address the issue of federalism that he raised. That is, he argues that bribery of a state official is usually prosecuted by the state, and federal jurisdiction is only extended to such acts when there is a federal nexus which, per Defendant, must be commercial in nature. Therefore, Defendant argues that applying §666 to his alleged acts "contravenes 'the ordinary rule of statutory construction that if Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so 'unmistakably clear in the language of the statute.'" Def. Obj. br. at p. 3 (*quoting Will v Michigan Dep't of State Police*, 491 U.S. 58, 65 (1989))(internal quotation marks omitted).

The Court finds that Defendant has not supported his argument that the drafters of §666 only intended it to apply to "business" or "transactions" that are commercial in nature. Defendant has not persuasively shown that the statute, the legislative history or case law dictates such a narrow interpretation. Indeed, the Black's Law Dictionary definition of "business" cited by Defendant in his brief includes transactions of a noncommercial nature and, ironically, refers to "a court's criminal business" as an example. Defendant cites no authority for his assertion that this extended definition should be disregarded as outside the "ordinary and natural" meaning of the term.

Additionally, it is not disputed that Defendant was employed by Macomb County

9

to prosecute criminal cases and that he was paid a salary for his services. Therefore, the Court agrees with the Magistrate that Defendant's prosecution of cases is plainly within the Black's Law Dictionary definition of "business" as "a particular occupation or employment habitually engaged in for livelihood or gain."

Finally, the legislative history Defendant cites does not directly or impliedly suggest the limitation Defendant advocates. Furthermore, although not at issue in *Salinas*, an argument can be made that there was a noncommercial element to the activities of the *Salinas* defendant. He was charged with abusing his authority by giving one inmate more privileges than was allowed other inmates, in exchange for gain to himself. Similarly, Defendant here is accused of abusing/using his authority to intervene on behalf of defendants in criminal prosecutions, for gain to himself. There is no apparent commercial aspect to either act.

For all of these reasons, the Court adopts the Magistrate's recommendation to deny Defendant's motion on this ground.

### ii.    Valuation

In Counts I and III of the Second Superceding Indictment, the Government refers to the criminal prosecutions in *People v Moldowan* and *People v Hulet*, respectively, as "a thing of value of $5,000 or more," in accordance with the requirements of §666(a)(1)(B). *See* Second Superceding Indictment at Count I, ¶3; Count III, ¶3. Defendant asserts, however, that Counts I and III must be dismissed because there is no valid way to place a monetary value on criminal prosecutions.

In support, Defendant cites *United States v McCormack*, 31 F.Supp.2d 176 (D.

10

Mass. 1998), and *United States v Frega*, 933 F.Supp. 1536 (S.D. Cal. 1996).  In *McCormack*, the defendant was indicted under §666 for allegedly paying a state police officer $4,000 to forego investigations of the defendant for various state offenses. Defendant moved for dismissal, arguing that the statutory requirements of §666 were not met in various respects, including the requirement that the thing of value be at least $5,000.  The Court found that §666 is ambiguous on how to measure value and from what perspective, especially where the benefit conferred is intangible and unrelated to federal funds.

Importantly, however, the Court noted that one accepted measure is the value to the alleged briber.  The Court went on to find that this measure was of no benefit to the government because the defendant only allegedly paid $4,000.  And, the Court rejected as speculative the government's other proposed measures.[1]  Among other defects, the Court ultimately found that the indictment failed to meet the $5,000 minimum and dismissed the indictment.

Here, Defendant argues that the Government is foreclosed from using the method recognized in *McCormack*--the value to the alleged briber--because the Government does not allege that method of valuation in the Indictment.  Rather, Defendant asserts that the Government refers only to the criminal prosecutions themselves as the "thing of value" worth $5,000 or more.

---

[1]The *McCormack* government's proposed measures included: a combination of defendant's lost wages and the value of being able to continue to live with his fiancee and daughter, if his bail were revoked; the salary of the state police officers defendant was attempting to corrupt, and; the value to the public of insuring that police functions are not corrupted and that defendant complied with bail conditions.

In *Frega*, two judges and an attorney were indicted under §666.  Over 12 years, the judges allegedly accepted lavish gifts from the attorney in exchange for favorable treatment in cases for which he was counsel of record and over which they presided.  Defendants moved to dismiss the §666 charge, arguing that the statute was not intended to reach their alleged conduct.  In its interpretation of the statute to determine its scope, the Court found that the indictment failed to allege that the cases over which the judges presided were valued at $5,000 or more.  The government alleged that over $100,000 in bribes were paid to influence the judges in state cases.  However, the Court found it troubling that the government failed to indicate how it intended to value the cases over which the judges presided.  The Court acknowledged three ways that the cases could be valued, including the value of each case to the attorney.  Nevertheless, it found that the statute was unclear regarding whether it applied to defendants' conduct.   The Court then analyzed the legislative history of the statute and ultimately held that §666 did not apply because federal funds were not implicated by defendants' alleged conduct.

Defendant acknowledges that the lack of clarity regarding how the government in *Frega* was going to value the cases was not the ultimate ground upon which the charge was dismissed.[2]  Nevertheless, Defendant contends that with both *Frega* and *McCormack,* "[c]entral to the logic of those decisions was the conclusion . . . that the monetary valuation of noncommercial official acts is simply an unworkable task."  Def.

---

[2]Notably, the *Frega* Court's dismissal because the government failed to establish that federal funds were directly implicated was subsequently abrogated by the Supreme Court's ruling in *Sabri v United States*, *supra*.

12

Obj. br. at p. 3.

The Magistrate recommends that the Court reject Defendant's arguments. Simply stated, the Magistrate finds that *McCormack* and *Frega* are inopposite, and that the Government adequately alleges that: 1)  the "business" in each case was the criminal prosecution; 2) the "transactions" were the specific acts of Defendant in each case in exchange for contributions and fundraising efforts; and 3) the business and/or transactions were valued at $5,000 or more.  The Magistrate notes that whether the Government can establish the statutory threshold at trial is yet to be determined.  But, the Magistrate asserts that an allegedly corrupt act in the prosecution of a lawsuit, like other intangibles, is subject to valuation by, for example, considering the amount paid for the corrupt act. The Court agrees.

Neither *McCormack* nor *Frega* supports Defendant's assertion that his alleged acts in *Moldowan* and *Hulet* are incapable of valuation.  In fact, both note that one accepted measure of intangible benefits conferred is the value to the briber, a proposition with which Defendant does not disagree.

Also, Defendant inaccurately asserts that the Second Superceding Indictment only refers to the criminal prosecutions themselves as being valued at $5,000 or more, as opposed to the value to those offering the bribe.  A fair reading of the Indictment, however, is not so limited.  In Count I, the Government states:

> Defendant Marlinga corruptly solicited, accepted, and agreed to accept such contributions and fundraising efforts intending to be influence and rewarded in connection with any business, transaction or series of transactions of the Macomb County Prosecutor's office **involving a thing of value of $5,000 or more, specifically the**

13

> **criminal case of *People v Moldowan*, *in that* (A) Defendant Marlinga was *motivated by the contributions and promises of fundraising efforts* to draft and file the Michigan Supreme Court a supplemental pleading** . . . and (B) Defendant Marlinga corruptly accepted and agreed to accept such contributions intending to be rewarded in connection with the filing of the Motion.

Second Superceding Indictment at Count I, ¶3 (emphasis added).  Count III regarding *People v Hulet* is worded in substantially the same manner.  *Id* at Count III, ¶3.

When read in its entirety, one cannot conclude that the Indictment simply says that the thing of value was the criminal prosecutions.  In fact, the Government asserts that the criminal prosecution was valued at $5,000 or more "in that" (or *because*) Defendant was motivated to act in exchange for promised contributions and fundraising efforts.  Therefore, the amount offered to Defendant in the form of contributions and fundraising efforts would represent the value of Defendant's alleged acts to those offering the bribes.  *McCormack* and *Frega* recognized this as a valid measure of value for purposes of §666, and there is no basis for the Court to find as a matter of law that the Government cannot meet its burden.  In fact, at the hearing held, the Government pointed out that it can prove that in excess of $5,000 was received by, or promised to Defendant, in support of the charges in both Counts.

For all of these reasons, the Court adopts the Magistrate's recommendation to deny Defendant's motion to dismiss Counts I and III.

### B.      COUNT II--MAIL FRAUD IN VIOLATION OF §18 U.S.C. 1341

18 U.S.C. §1341 applies to those who utilize the mail to carry out fraud and states in relevant part:

14

> Whoever, having devised or intending to devise any *scheme or artifice to defraud*, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, . . . shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

(emphasis added).  A "scheme or artifice to defraud" is "a scheme or artifice to deprive another of the intangible right of honest services."  18 U.S.C. §1346.

The Government alleges that Defendant violated §§1341 and 1346 by making false or misleading statements in his supplemental pleading to the Michigan Supreme Court in *People v Moldowan*.  Specifically, Defendant implied in his appellate brief that there were later-discovered alibi witnesses who could no longer be found, in part because it was the nature of the witnesses at issue to use fake names.  But, per the Government, there were no such witnesses, and no witness (alibi or otherwise) used a fake name.  The Government alleges that Defendant's allegedly false and/or misleading statements violated his obligation under the Michigan Rules of Professional Conduct not to make false statements to a court:

> Rule 3.3 Candor Toward the Tribunal
>
> (a) A lawyer shall not knowingly:
>
> (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer

MRPC 3.3(a)(1).  The Government alleges in the Indictment that Defendant "knowingly

and willfully devised and intended to devise a scheme to defraud the Michigan Supreme Court and the citizens of Macomb County of their right to his honest services."  Second Superceding Indictment at Count II, ¶6.

Defendant asserts that the allegations in Count II fail on one of two alternate grounds: 1) that the Michigan Rules of Professional Conduct governing attorney ethics do not create the kind of duty for "honest services" that can be prosecuted under §1346, and 2) even if a violation of the MRPC can be the predicate of a §1341 charge, his alleged misstatements are not sufficiently material to support the charge.  The Magistrate recommends that the Court agree in part with the first argument, but reject the second in its entirety.

Defendant argues that the rights of citizens to "honest services" as used in §1346 is limited to the rights and duties imposed by state law.  *See United States v Brumley*, 116 F.3d 728, 734 (5th Cir. 1978)("We decide today that services must be owed under state law and that the government must prove in a federal prosecution that they were in fact not delivered.").  In this case, however, the Government bases its claim on Defendant's alleged violation of his ethical obligation under the MRPC.  The Government admits these rules do not have the force of law.  Therefore, Defendant contends that the Government has not alleged a viable charge of mail fraud.

Defendant further asserts that his alleged obligation to be candid with courts is not a "service" within the meaning of §1346.  Defendant argues that, under our adversary system, attorneys do not perform "services" for the courts before which they appear, only for their clients.  That is, Defendant asserts that attorneys only have *duties*

16

to the court, one of which is set forth in MRPC 3.3(a)(1), which they must fulfill when they appear before courts to perform *services* on behalf of clients.

The Magistrate does not directly address Defendant's first argument, but agrees with the second: "I agree with Defendant that the concepts of 'duty' and 'services' are separate and distinct, and that the right to honest services connotes more than a duty. It requires a master-servant or agent-principal relationship which does not exist between a court and the attorney who practice before it."  R&R at p. 25.  Therefore, the Magistrate finds that "the Government's prosecution theory against this Defendant under 18 U.S.C. §§1341 and 1346 for violation of the Michigan Supreme Court's right to his honest services is insufficient in law. . . . Further, I conclude that the language of the Indictment suggesting that the Michigan Supreme Court had a right to Defendant's honest services is prejudicial, as it tends to vilify Defendant by the assertion of the violation of a right to services that does not exist."  *Id* at p. 28.

But, the Magistrate contends that it is without question that Defendant owed a duty of honest services to Macomb County and Michigan citizens.  He asserts that MRPC 3.3 shows that a duty of honesty is among the duties owed, and that the Government adequately alleges violation of the mail fraud statute.  Therefore, the Magistrate asserts that, if all reference to the Michigan Supreme Court is excised from paragraphs 3, 6 and 8 of Count II, the Government can proceed on its claim that Defendant deprived the citizens of Macomb County of his honest services.  The Magistrate contends that the proposed redaction of the indictment would not be an unconstitutional amendment of the Indictment, because the language redacted is mere

17

surplusage that is not necessary for jurors to find that Defendant deprived Macomb County citizens of his honest services.

Defendant asserts that the proposed redaction of one of the Government's theories of culpability is insufficient to correct the defect in the Indictment, because both theories are based on the same improper premise--that a charge of mail fraud under §1346 can be based on a violation of MRPC 3.3(a)(1), rather than a state law. Therefore, Defendant argues that, even as amended, the Indictment does not state a cognizable charge.

There is support for Defendant's position. It does not appear that the Sixth Circuit has addressed the issue of whether a mail fraud charge must be based upon a violation of state law. However, at least two circuits have directly addressed the issue and take the position Defendant advocates.

In *United States v Brumley*, *supra*, the Fifth Circuit defendant was the Regional Associate Director of the Texas Workers' Compensation Commission. His duties brought him in contact with attorneys pursuing claims on behalf of workers' compensation claimants. Despite his position, he solicited loans from lawyers representing claimants as well as assistance in obtaining loans from lending institutions. Defendant was convicted in a bench trial of, *inter alia*, conspiring to defraud the citizens of Texas of honest services by use of mail and wire.

Defendant appealed his convictions, arguing that the "honest services" statute did not apply to state employees who commit ethical or misdemeanor violations. The *Brumley* Court, therefore, analyzed the relationship between the federal statute and

18

state law.  The Court found that the statute dictates that an "honest services" charge

must be based upon a Defendant's violation of a state-law duty:

> Under the most natural reading of the statute, a federal prosecutor
> must prove that conduct of a state official breached a duty respecting
> the provision of services owed to the official's employer under state
> law. Stated directly, the official must act or fail to act contrary to the
> requirements of his job under state law. This means that if the official
> does all that is required under state law, alleging that the services
> were not otherwise done "honestly" does not charge a violation of the
> mail fraud statute. The statute contemplates that there must first be a
> breach of a state-owed duty.

116 F.3d at 734.[3]  Because Brumley's conduct violated Texas criminal law, his

convictions were affirmed.

Similarly, in *United States v Panarella,* 277 F.3d 678 (3rd Cir. 2002), the

defendant was convicted as an accessory after-the-fact to a wire fraud scheme by a

state senator to deprive the public of his (the senator's) honest services.  Defendant

operated a tax collection business that entered contracts with state and local

government bodies to collect taxes owed to them under state and local tax law.

Defendant hired the senator as a consultant and paid him consulting fees.  Without

disclosing his relationship to defendant, the senator subsequently supported

defendant's efforts to obtain contracts and voted against legislation that would have

been harmful to defendant.

Defendant appealed his conviction arguing that the government did not allege an

"honest services" violation by the senator, because it did not allege that Defendant's

---

[3]The Court declined to reach the question of whether the breach of duty must
violate criminal state law.

payments were bribes or that the senator was improperly influenced.  The Court rejected defendant's arguments and held that "where a public official takes discretionary action that the official knows will directly benefit a financial interest that the official has concealed in violation of a state criminal law, that official has deprived the public of his honest services under 18 U.S.C. §1346."  277 F.3d at 691.

The Government relies on several cases that are inopposite.  *United States v Frost*, 125 F.3d 346 (6th Cir. 1997), did not involve public officials.  In *United States v Mack*, 159 F.3d 208 (6th Cir. 1998), there was a clear violation of Ohio law that formed the predicate for the charge.

While the Court in *Panarella* declined to reach the question of whether a violation of state law is always necessary, it reasoned that the use of state law to define the parameters of honest services fraud best addresses federalism concerns:

> We are mindful that the prosecution of state public officials for honest services fraud raises federalism concerns about the appropriateness of the federal government's interference with the operation of state and local governments.
>
> * * *
>
> In our view, use of state law as a limiting principle defining the scope of honest services fraud in close cases better addresses these federalism concerns than does the limiting principle of misuse of office for personal gain, which Panarella urges upon us.
>
> In this case, the intrusion into state autonomy is significantly muted, since the conduct that amounts to honest services fraud is conduct that the state itself has chosen to criminalize.

*Id* at 693.  The Court found that the facts alleged in the Information established that the senator clearly violated Pennsylvania state common and criminal law.  *Id* at 696.

Therefore, defendant's conviction was affirmed.

The Third Circuit went further in *United States v Murphy*, 323 F.3d 102, 115 (2003). The *Murphy* Court held that the government must prove not only a violation of state law, but violation of a state law which creates a duty between the public official and the public. The *Murphy* defendant was the Chairman of the Republican Party in Passaic County, New Jersey. He was convicted on, *inter alia*, three counts of mail fraud for organizing a contract-for-payment scheme using his influence over Passaic County officials to procure contracts for a medical services company. In turn, the medical services company siphoned a portion of the money it received from the contracts to four people chosen by defendant, but who performed no services for the payments.

One of three theories the government asserted was that defendant deprived the County of its right to his honest services by not informing County officials about the fraudulent nature of the contract-for-payment scheme. Defendant appealed his conviction under this theory on the ground that the district court allowed the jury to consider the claim absent proof of a legal duty created by state law. Although it did not allege as much in the Indictment, the government asserted on appeal that the state bribery statute was the predicate state law that created defendant's fiduciary obligation to disclose material information to Passaic County.

The *Murphy* Court rejected the government's argument because the state bribery statute did not explicitly require party officials to disclose information to the government; it only prohibited solicitation or acceptance of bribes. The Court asserted that, unless the state law violated created a fiduciary duty between the official and the public, any

21

criminal act could form the basis of a mail fraud conviction:

> Reading the New Jersey Bribery Act as the Government does would require us to find not merely a duty owed in that statute, but also the predicate for a fiduciary relationship between a county political chairman and the public. We cannot endorse this methodology because all criminal activity would breach a duty to the public not to break the law that could then form the basis of a mail fraud conviction. This outcome would, of course, run counter to the federalism concerns we expressed in *Panarella* about the potentially limitless application of §1346.  While we recognize that the New Jersey Bribery Act properly restricts the conduct of party officials, probably in recognition of their influential political position, we cannot read it as creating a fiduciary or other legal relationship to the public.

323 F.3d at 117.

*Brumley*, *Panarella* and *Murphy* are persuasive authority that mail fraud claims must be rooted in state law.  However, the Magistrate glossed over the issue by simply asserting that the Government "properly cited numerous cases enunciating the principle that a prosecuting attorney owes professional, fiduciary and ethical duties to the people he serves, both the innocent and the guilty."  R&R at p. 26.  The Magistrate does not indicate the cases to which he is referring.  But, it appears that he is referring to a number of state law cases the Government cites in support of its apparent assertion that state common law imposes a duty of honesty on prosecuting attorneys.  *See People v Carr*, 64 Mich. 702 (1887); *People v Moyer*, 77 Mich. 571 (1889); *People v Bussey,* 82 Mich. 49 (1890); *Engle v Chipman*, 51 Mich. 524 (1883); and, *People v Monroe*, 189 Mich. App. 315 (1991).  In each of those cases, the prosecutor was found to have used illegal or unethical tactics in trial, and the courts each admonished the behavior and reiterated the prosecutor's obligation to refrain from it.  None of the courts' assertions in

this regard, however, were central to the courts' rulings regarding the effect of the prosecutor's behavior on the defendant's right to a fair trial.  In fact, the language the Government relies upon reads in each case like editorial comments rather than pronouncements of common law.

Consequently, the cases cited by the Government do not persuasively establish that Michigan recognizes an actionable common law duty of honesty by prosecutors (or attorneys in general).  Moreover, if the Court were to accept the Government's assertion that a prosecuting attorney's general duty of honesty is sufficient to bring him or her within the bounds of §§1341 and 1346, countless Michigan lawyers (including those working in other capacities that involve an element of public service) would be subject to prosecution for conduct which the State of Michigan has not clearly indicated an intent to criminalize or impose civil liability.

For these reasons, the Court finds that Count II must be dismissed.  It is unnecessary to address other issues raised in Defendant's objections (i.e., redaction, materiality).

### C.      COUNT IV--WIRE FRAUD IN VIOLATION OF §18 U.S.C. 1343

Similar to mail fraud, 18 U.S.C. §1343 prohibits the use of interstate wires for any "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises[.]" In Count IV, in connection with his alleged attempt to further the personal interests of the attorneys and criminal defendant in *People v Hulet,* Defendant is alleged to have violated §1343.  The Government specifically alleges that Defendant transmitted, and caused to be transmitted, by means

23

of wire in interstate commerce, a Federal Election Commission Report form which concealed the fact that one of Hulet's attorneys donated $4,000.

One essential element of a wire fraud claim is that it be "in furtherance of" the scheme to defraud. *United States v Hartsel,* 199 F.3d 812, 816 (6th Cir. 1999).[4] Defendant asserts that dismissal of this claim is required because, at the time of the transmission, he had already received and reported contributions from the attorney at issue. Therefore, he says that the transmission cannot fairly be said to have been "in furtherance of" the alleged scheme, but rather was merely incidental.

The Magistrate points out that the Government clearly alleges that Defendant concealed the true identity of the donor because the $4,000 donation at issue exceeded the amount individual donors are permitted to give under federal law. And, it is settled that a wire transmission can be deemed "in furtherance of "a scheme if the scheme's completion or the prevention of detection depended in some way on the transmission. *Hartsel*, 199 F.3d at 816. Since the Government clearly alleges that the transmission at issue was made to prevent detection of Defendant's evasion of federal campaign contribution limitations, the Magistrate found that the Government alleged a viable claim in Count IV.

In objection, Defendant simply restates the arguments asserted in his Motion. The Court rejects his assertions for the reasons stated by the Magistrate. Defendant's argument lacks merit in that it completely ignores the explicit theory asserted by the

---

[4]*Hartsel* actually involved a claim of mail fraud. But, except for the difference in the medium used to carry out the scheme, the same proofs are required for mail and wire fraud charges. *United States v Griffith*, 17 F.3d 865, 874 (6th Cir. 1994).

Government.  The Court adopts the Magistrate's recommendation that the Court deny Defendant's motion to dismiss Count IV.

###   D.   COUNTS V AND VI--FALSE STATEMENT IN VIOLATION OF 18 U.S.C. 2, 1006

Per Defendant, Counts V and VI of the Second Superceding Indictment are essentially identical to Counts V and VIII of the original Indictment.  In a prior Motion to Dismiss, Defendant argued that the charges should be dismissed because the contributions referred to therein were not "conduit" contributions within the meaning of the Federal Election Campaign Act of 1971.  The Court denied Defendant's motion. *See* Opinion and Order Regarding Motions to Dismiss, February 28, 2005.  Defendant moves for dismissal a second time on the same grounds, but does so solely to preserve the issue, incorporating by reference the arguments previously made.

As the Magistrate recommends, the Court denies Defendant's motion to dismiss Counts V and VI for the reasons already stated in the Court's February 28, 2005 Order denying Defendant's motion to dismiss Counts V and VIII of the original Indictment.

##   V.   CONCLUSION

The Court declines to adopt the Magistrate's recommendation with regard to Count II, but does adopt the recommendation with regard to the remaining Counts (I, III-VI).

Trial will proceed on all Counts except Count II, which is dismissed.

**IT IS SO ORDERED.**

S/Victoria A. Roberts

Victoria A. Roberts

United States District Judge

Dated:  July 25, 2006

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on July 25, 2006.

S/Carol A. Pinegar

Deputy Clerk